2017 ND 19

**Darwin and Jean KRENZ, Plaintiffs, Appellees and Cross–Appellants**

v.

**XTO ENERGY, INC., Defendant, Appellant and Cross– Appellee**

**No. 20160096**

Supreme Court of North Dakota.

Filed 2/16/2017

Charles M. Carvell (argued), P.O. Box 400, Bismarck, N.D. 58502–0400, and R. Kirk Mueller (appeared), 1550 17th Street, Suite 500, Denver, CO 80202, for plaintiffs, appellees and cross-appellants.

Michael D. Schoepf (argued) and Lawrence Bender (on brief), 1133 College Drive, Suite 1000, Bismarck, N.D. 58501, and Leah C. Janus (appeared), 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402–1425, for defendant, appellant and cross-appellee.

Sandstrom, Surrogate Judge.

[¶ 1] XTO Energy, Inc., appeals and Darwin and Jean Krenz cross-appeal from a judgment awarding the Krenzes $800,000 for a pipeline trespass and ordering the parties to abide by certain documents for their future relationship after the district court construed a pipeline easement to authorize one pipeline on the Krenzes' land and found XTO's unauthorized construction and operation of a second pipeline on the Krenzes' land and use of their private road was a trespass. We conclude an April 2007 pipeline easement is ambiguous and the court erred in construing the easement as a matter of law. We reverse the court's decision construing the pipeline easement and awarding the Krenzes $800,000 for the pipeline trespass and the court's decision requiring the parties to abide by their unexecuted negotiations involving their future relationship. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

I

[¶ 2] In 1972, the Krenzes purchased the surface estate for land in Township 154 North, Range 95 West in Williams County consisting of parts of sections 9, 10, 14, 15,

22, and 23. XTO owns severed mineral interests in parts of sections 14, 15, 21, 22, and 23. The dispute in this case involves XTO's construction and operation of a gas pipeline across the Krenzes' land in section 15 and XTO's use of the Krenzes' private road in section 15 and other land subject to a mineral lease in sections 14 and 15 to access a well in section 23.

[¶ 3] In February 2007, the Krenzes granted XTO's predecessor in interest an easement authorizing construction of a gas pipeline in the north half of section 9. Under that easement, an east-west pipeline was constructed to collect gas from other pipelines connected to wells in the area. In April 2007, the Krenzes executed another pipeline easement with XTO's predecessor in interest, authorizing construction and operation of "pipelines" across parts of the Krenzes' land in sections 9, 10, and 15.

[¶ 4] In 2008, XTO drilled three wells in section 21, collectively referred to by the parties as the Southern Wells, and constructed a north-south pipeline from those three wells through state-owned land in section 16 and the Krenzes' land in section 9 to the east-west pipeline in the north half of section 9. In November 2008, the Krenzes and XTO executed a surface damage agreement for roads, authorizing XTO to use the Krenzes' roads and lands to access XTO's "oil and gas properties" and "wellsites for conducting oil and gas operations, production and transportation." The agreement stated the location of the Krenzes' private roads to be used by XTO was more particularly described on an attached map. A map attached to the agreement showed the Krenzes' private road entering the northwest quarter of section 15 and running southeast to a junction in the southeast quarter of section 15 and then running west and south across the

Krenzes' land in the south half of section 15 to the Southern Wells in section 21. A handwritten notation on the attached map stated the area east of the junction was "not a road." XTO initially used the Krenzes' private road in section 15 to access the Southern Wells in section 21.

[¶ 5] XTO is a lessee under a 2004 mineral lease from the Mendenhall family for mineral interests on the Krenzes' land in parts of sections 14, 15, 22, and 23. In February 2010, XTO spud (started) the Ward Well on the Krenzes' land in the northwest quarter of the northwest quarter of section 23. The Ward Well is located on a two-section spacing unit consisting of sections 23 and 26 and is subject to a forced-pooling order issued by the North Dakota Industrial Commission. The only land in the two-section spacing unit subject to the Mendenhall lease is the northwest quarter of the northwest quarter of section 23.

[¶ 6] XTO and the Krenzes then engaged in negotiations regarding a pipeline easement, a road use agreement, and a surface damage agreement for XTO's operations involving the Ward Well. The Krenzes ultimately signed a pipeline easement, a road use agreement, and a surface damage agreement in November 2010 and sent the documents to XTO. XTO refused to sign the documents, however, claiming the recently discovered April 2007 pipeline easement authorized it to construct a pipeline from its north-south pipeline in section 16 through section 15 to the Ward Well in section 23 and the 2008 road use agreement authorized it to use the Krenzes' private road in section 15 to access the Ward Well. XTO also claimed its rights under the Mendenhall lease authorized it to use the Krenzes' land subject to that lease in sections 14 and 15 to access the Ward Well in section 23.

[¶ 7] The Krenzes initially sued XTO in state court for a declaration the April 2007 easement was void and unenforceable. They alternatively sought a declaration the easement limited XTO to one pipeline on their land, which they claimed had been constructed in 2008 in section 9. The Krenzes sought to enjoin XTO from constructing a pipeline across their land in section 15 to the Ward Well.

[¶ 8] XTO removed the Krenzes' lawsuit to federal district court, and the Krenzes moved to remand the action to state court, claiming the amount in controversy did not exceed $75,000. In support of their motion, the Krenzes' son, Courtney Krenz, filed an affidavit valuing the pipeline easement at $28,936.90 under the parties' 2010 negotiations for an easement. The federal district court granted the Krenzes' motion for remand to state district court.

[¶ 9] In April 2011, the state district court denied the Krenzes' motion to preliminarily enjoin XTO from constructing a pipeline across their land in section 15 during the lawsuit, stating it found "good arguments for and against each party." In August 2011, XTO constructed a pipeline from its existing north-south pipeline in section 16 across the Krenzes' land in section 15 to the Ward Well in section 23 and began operating that pipeline. Part of the pipeline is on land subject to the Mendenhall lease in sections 14 and 15. XTO also constructed an access road to the Ward Well on land subject to the Mendenhall lease in sections 14 and 15, and that access road connects to the Krenzes' private road in section 15.

[¶ 10] After XTO constructed the pipeline to the Ward Well, both parties moved for summary judgment on the Krenzes' claim the April 2007 easement did not authorize XTO to construct and operate a pipeline across their land in section 15. The district court granted the Krenzes' motion for summary judgment, ruling as a matter of law the April 2007 easement did not authorize XTO to construct the pipeline. The court ruled the easement allowed

XTO to have one pipeline across the Krenzes' land and XTO's 2008 construction of the north-south pipeline on the Krenzes' land in section 9 to connect to the Southern Wells in section 21 fixed the location for that pipeline by use and acquiescence.

[¶ 11] The district court granted the Krenzes' motion to amend their complaint. In their amended complaint, the Krenzes alleged a claim for trespass for XTO's unauthorized construction and operation of the pipeline across their land in section 15 and XTO's unauthorized use of the Krenzes' private road in section 15 to access the Ward Well. The Krenzes also asserted a claim for unjust enrichment, alleging XTO had been unjustly enriched by its operation of oil and gas facilities on the Krenzes' land. They further alleged a claim for surface damages under N.D.C.C. ch. 38–11.1. The Krenzes sought injunctive relief requiring XTO to stop using and to remove the pipeline in section 15, to perform its obligations under the 2010 negotiations and documents signed by the Krenzes in November 2010, and to stop using land subject to the Mendenhall lease in sections 14 and 15 to benefit mineral interests located in the Ward Well spacing unit but not subject to the Mendenhall lease. The Krenzes also sought damages for their claims.

[¶ 12] Before trial, the district court ruled the 2008 road use agreement was ambiguous and extrinsic evidence was necessary to determine whether the agreement authorized XTO to use the Krenzes' private road in section 15 to access the Ward Well in section 23. The court also ruled XTO could use the Krenzes' land subject to the Mendenhall lease in sections 14 and 15 to develop all the minerals from the Ward Well, including the interests in the two-section spacing unit not subject to the Mendenhall lease. The court further ruled the parties' 2010 negotiations for a pipeline easement, a road use agreement, and a surface damage agreement did not culminate in a binding contract.

[¶ 13] After a bench trial, the district court said it was adopting the Krenzes' "spin on the facts." The court said the dispute was about the appropriate remedies and explained XTO used the Krenzes' property against their wishes with full knowledge of the possible consequences. The court reiterated that XTO's construction and operation of the pipeline in section 15 during the lawsuit was not an innocent trespass. The court also relied on extrinsic evidence and construed the 2008 road use agreement to preclude XTO from using the Krenzes' private road in section 15 to access the Ward Well. The court ruled XTO's use of the road for that purpose was a trespass.

[¶ 14] The court declined to enjoin XTO from using the pipeline in section 15 to service the Ward Well, or to enjoin XTO from using the Krenzes' private road in section 15 to access that well. Rather, the court awarded the Krenzes $800,000 in damages for the pipeline trespass, saying it was "the amount XTO would save by virtue of not having to build a new pipeline across the Corps of Engineers' land" and "approximates the amount by which the Krenzes have been 'impoverished,' while XTO has been unjustly enriched by the trespass." The court explained the amount specifically covered the rentals the Krenzes would have received under 2010 negotiations between the parties in the approximate amount of $150,000, plus five years of litigation costs and fees they would have been entitled to under surface damage compensation law in N.D.C.C. ch. 38–11.1. The court said the damage award allowed XTO to continue operating the Ward Well and retain 98 percent of the $32,500,000 in revenues received from the Ward Well.

[¶ 15] The district court also ruled that although the parties' 2010 negotiations and documents signed by the Krenzes in November 2010 for a pipeline easement, a road use agreement, and a surface damage agreement were not binding contracts, the parties were required to abide by the terms of the documents to establish protocols for the parties' future relationship. Although the court ruled XTO's use of the Krenzes' private road in section 15 to access the Ward Well was also a trespass, the court cited its damage award for the pipeline trespass and did not award the Krenzes a separate or additional damage award for the road trespass. The court also cited its award for the pipeline trespass and declined to make a separate award for surface damages under N.D.C.C. ch. 38–11.1.

[¶ 16] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. XTO's appeal and the Krenzes' cross-appeal are timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 28–27–01.

## II

[¶ 17] The district court decided some issues in this case by summary judgment, which:

is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In determining whether summary judgment was appropriately granted, we must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the record. On appeal, this Court decides whether the information available to the district court precluded the existence of a genuine issue of material fact and entitled the moving party to judgment as a matter of law. Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record.

Riverwood Commercial Park v. Standard Oil Co., 2011 ND 95, ¶ 6, 797 N.W.2d 770 (quoting Missouri Breaks, LLC v. Burns, 2010 ND 221, ¶ 8, 791 N.W.2d 33). Summary judgment is appropriate if reasonable minds could reach only one conclusion from the evidence submitted to the district court. Ackre v. Chapman & Chapman, P.C., 2010 ND 167, ¶ 6, 788 N.W.2d 344.

[¶ 18] The district court also decided some issues in this case after a bench trial. Our review of factual findings after a bench trial is governed by the clearly erroneous rule of N.D.R.Civ.P. 52(a). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made. Hogan v. Hogan, 2003 ND 105, ¶ 6, 665 N.W.2d 672. A court's choice between two permissible views of the weight of the evidence is not clearly erroneous, and simply because we may have viewed the evidence differently does not entitle us to reverse the court. Id. On appeal, we do not reweigh conflicts in the evidence. Center Mut. Ins. Co. v. Thompson, 2000 ND 192, ¶ 20, 618 N.W.2d 505. Rather, we give due regard to the court's opportunity to judge the credibility of the witnesses. N.D.R.Civ.P. 52(a)(6). A

court's findings must be stated with sufficient specificity to enable a reviewing court to understand the factual basis for the court's decision. In re Griffey, 2002 ND 160, ¶ 8, 652 N.W.2d 351.

III

A

[¶ 19] XTO argues the district court erred in ruling XTO's extension of its pipeline across the Krenzes' land in section 15 was not authorized by the April 2007 easement and was a trespass.

[¶ 20] In granting the Krenzes' summary judgment on this issue, the district court interpreted the April 2007 easement to authorize XTO to construct one pipeline on the Krenzes' land. The court ruled any ambiguity in the easement was cured by the 2008 construction of a north-south pipeline on their land in section 9 to the three Southern Wells in section 21, which fixed the location of the one pipeline by use and acquiescence. The court also explained interpreting the April 2007 easement to also allow XTO to construct a pipeline in section 15 would constitute a blanket easement, which is "disfavor[ed]" by N.D.C.C. § 47–05–02.1. The court ruled as a matter of law the April 2007 easement did not authorize XTO to construct and operate the pipeline across the Krenzes' land in section 15 and XTO's construction and operation of that pipeline was a trespass.

[¶ 21] XTO argues the plain language of the 2007 easement authorized it to construct one pipeline through parts of both sections 9 and 15. XTO contends its 2008 construction of a pipeline on the Krenzes' land in section 9 did not foreclose the continuation of the construction of one pipeline in section 15 and its construction and operation of its pipeline across the Krenzes' land in section 15 was not a

trespass. XTO asserts the language for "one pipeline within the surveyed right of way" means it is limited to one pipeline in the pipeline trench and authorizes it to put only one pipeline in the right of way ultimately surveyed for the pipeline route.

[¶ 22] An easement is an interest in land consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose. Riverwood Commercial Park, 2011 ND 95, ¶ 8, 797 N.W.2d 770. Grants of interests in land are "interpreted in like manner with contracts in general." N.D.C.C. § 47–09–11. In Riverwood Commercial Park, at ¶ 7 (quoting Kuperus v. Willson, 2006 ND 12, ¶ 11, 709 N.W.2d 726), we described rules for interpreting contracts:

Contracts are construed to give effect to the mutual intention of the parties at the time of contracting. The parties' intention must be ascertained from the writing alone if possible. A contract must be construed as a whole to give effect to each provision, if reasonably practicable. We construe contracts to be definite and capable of being carried into effect, unless doing so violates the intention of the parties. Unless used by the parties in a technical sense, words in a contract are construed in their ordinary and popular sense, rather than according to their strict legal meaning.

If a written contract is unambiguous, extrinsic evidence is not admissible to contradict the written language. However, if a written contract is ambiguous, extrinsic evidence may be considered to show the parties' intent. Whether or not a contract is ambiguous is a question of law. An ambiguity exists when rational arguments can be made in support of contrary positions as to the meaning of the language in question.

[¶ 23] The April 2007 easement identifies the Krenzes as the grantors and XTO's

predecessor in interest as the grantee and provides:

"For adequate consideration, Grantor, named above, does hereby grant, convey and warrant unto Grantee, named above, a Right of Way and Easement (the 'Right of Way') on which to survey, construct, lay, repair, maintain, operate, patrol and remove pipelines and replace existing lines with other lines for the transportation of oil, gas, the products thereof, water or any other fluid or substance, together with the right to install valves, fittings, meters, meter stations and similar appurtenances as may be necessary or convenient to the operation of lines installed by Grantee, and to erect, repair, maintain, operate, patrol and remove electric lines, telephone lines, graphite and steel anodes and other devices for the control of pipeline corrosion, over, through, on, under and across the following lands (the 'Lands') located in the County and State named above.

TOWNSHIP 154 NORTH, RANGE 95 WEST, 5TH PM

Section 9: E½

Section 10: W½SW¼, SE¼SW¼

Section 15: NW¼, W½NE¼, N½S½, S ½SE¼, SE¼SW¼

This easement will be limited to a maximum of one pipeline within the surveyed right of way. Centerline description and width to be described in surveyor's plat.

"Grantee is granted the right of ingress and egress across all of the Lands. Grantee is also granted the exclusive right and privilege to select the route of any and all pipelines and other devices, and to do any and all things that may be required for the enjoyment of the rights granted by Grantor. The Grantee agrees to replace all fences, terraces, contours and drainage ditches, and to pay any damages which may arise to growing corps [sic] and timber form [sic] the construction, maintenance and operation of said lines and appurtenances. Grantee shall have the right from time to time to cut or clear trees, brush and other obstructions on said Right of Way that may interfere with the operation or maintenance of Grantee's facilities.

"The Right of Way and the privileges granted to Grantee herein are assignable or transferable, in whole or in part, and the terms and provisions of this Right of Way shall be binding upon the heirs, executors, administrators, successors and assigns of Grantor. The consideration paid to Grantor by Grantee for the execution and delivery of this Easement is deemed full payment for Grantee's use of such Easement during its entire term."

[¶ 24] According to XTO, its predecessor in interest paid the Krenzes $18,800 for the April 2007 easement based on the use of an estimated 640 rods at the rate of $20 per rod, plus a $6,000 signing bonus. In the April 2007 easement, the Krenzes expressly granted XTO authority to construct, repair, and maintain "pipelines" and "lines" across specific parts of the Krenzes' land in sections 9, 10, and 15 and gave XTO "the exclusive right and privilege to select the route of any and all pipelines" across the Krenzes' land. The easement also stated it was "limited to a maximum of one pipeline within the surveyed right of way" with "[c]enterline description and width to be described in surveyor's plat." A surveyor's plat was not contemporaneously attached to the easement.

[¶ 25] XTO argues that while the easement does not allow the construction of a separate, second pipeline alongside or within the same right of way as the already-built portion of its pipeline in section 9, the 2008 construction in section 9 did not foreclose the continuation of construc-

tion of the one pipeline in section 15. XTO relies on our decision in Royse v. Easter Seal Soc'y, 256 N.W.2d 542, 546 (N.D. 1977) for the proposition that an easement created by an express grant is not extinguished by partial use. XTO also argues the Krenzes were compensated $18,800 for the April 2007 easement, which was calculated at $20 per rod for an estimated 640 rods of pipeline, plus a $6,000 bonus. XTO claims, if the 2007 easement only allowed construction of the pipeline in section 9 as determined by the district court, the Krenzes' compensation was more than $50 per rod. XTO also claims allowing that construction of a pipeline in section 15 does not create an invalid "blanket easement" under N.D.C.C. § 47–05–02.1.

 [¶ 26] While N.D.C.C. § 47–05–02.1 was enacted to "discourage" blanket easements, the statute does not authorize a court to invalidate an otherwise binding, voluntary contract between parties. Judicial holdings in sister jurisdictions support this conclusion. See Strauch v. Coastal States Crude Gathering Co., 424 S.W.2d 677, 681 (Tex. Civ. App. 1968) (failure to spell out all terms in an easement does not render rights granted unenforceable); Armstrong v. Skelly Oil Co., 81 S.W.2d 735, 736 (Tex. Civ. App. 1935) (where neither party to the right-of-way agreement knew at the time of execution where the pipeline would be laid, holding that "the written lease vested the right in [the grantee], within reasonable limitations, to select the location for a pipe line."). See also 61 Am. Jur. 2d Pipelines § 31 (2016) ("Even if a grant does not describe the route over which the line is to be laid, the grant is not nullified."). Section 47–05–02.1, N.D.C.C., requires that the area of land to be covered by an easement be "properly described." This Court noted the legislative history of this section shows the bill as introduced required an ease-

ment be described "with particularity." Burlington N.R.R. Co. v. Fail, 2008 ND 114, ¶ 6, 751 N.W.2d 188. After a hearing in the Senate Agricultural Committee, the words "with particularity" were deleted and replaced with "properly" and the statute requires that an easement be "properly described." Id. In Fail we said that requirement was meant to avoid fraud in easements reserved in a deed conveying a tract of land. Id. at ¶ 7. In other words, a reserved easement may not encompass all of the granted property unless expressly described. Id. Those same concerns do not exist here, where the easement was separately negotiated and affirmatively granted, rather than reserved by a party making a conveyance. Rather the issue in this case is the interpretation of the granting language in the April 2007 easement.

[¶ 27] The Krenzes created the April 2007 easement by expressly granting XTO's predecessor in interest the right to construct "pipelines" and "the exclusive right and privilege to select the route of any and all pipelines." The easement also says it is limited to "one pipeline within the surveyed right of way." On its face, the language of the easement is not clear about whether the Krenzes granted an easement for one pipeline in the entire described area, or for one pipeline in each described section. Because of the conflicting references to "pipelines" and "one pipeline," the timing of construction and selection of the pipeline route, and our law that an easement created by an express grant is not extinguished by the partial use, we conclude the April 2007 easement is subject to rational arguments for contrary interpretations and is ambiguous. Because we conclude the easement is ambiguous, extrinsic evidence may be considered to show the parties' intent and summary judgment on that issue was not appropriate. See Hamilton v. Woll, 2012 ND 238, ¶ 13, 823 N.W.2d 754 ("A motion

for summary judgment is not an opportunity to conduct a mini-trial" and "summary judgment is inappropriate if the court must draw inferences and make findings on disputed facts to support the judgment." (internal citation omitted)). We therefore reverse the summary judgment on that issue and remand for further proceedings.

B

[¶ 28] XTO argues the plain language of the 2008 road use agreement authorized it to use the Krenzes' private road in section 15 to access all its well sites, including the Ward Well in section 23. XTO claims extrinsic evidence also supports its use of the Krenzes' private road to access that well.

[¶ 29] The district court ruled the 2008 road use agreement was ambiguous. The agreement says the "location of the private roads to be used by [XTO] is more particularly described" in an "attached map," and a map attached to the agreement states an area east from the junction of the Krenzes' private road in section 15 is "not a road." At the time of the agreement, the Ward Well had not been spud, and the notation on the attached map reflects ambiguity about XTO's use of the area described as "not a road." We conclude the court did not err in deciding the 2008 road use agreement was ambiguous.

[¶ 30] After considering extrinsic evidence, the district court construed the 2008 road use agreement to authorize XTO to use the Krenzes' private road to access only the Southern Wells in section 21 and not the Ward Well in section 23. The court ruled XTO's use of the Krenzes' private road in section 15 to access the Ward Well was a trespass. Although the court's findings are meager, the court explained the Krenzes' evidence about the meaning of the 2008 road use agreement was more

credible and did not support XTO's use of the Krenzes' private road in section 15 to access the Ward Well. We can understand the rationale for the court's decision. Evidence in the record supports the court's findings, and we are not left with a definite and firm conviction the court made a mistake in weighing the evidence. We conclude the court did not clearly err in deciding the parties intended the 2008 road use agreement to authorize XTO to use the Krenzes' private road in section 15 to access only the Southern Wells. We therefore conclude the court did not err in ruling XTO's use of the Krenzes' private road in section 15 to access the Ward Well in section 23 was not authorized by the 2008 road use agreement and was a trespass.

IV

[¶ 31] XTO raises several issues about the district court's remedies for the trespasses.

A

[¶ 32] XTO initially argues the Krenzes are judicially estopped from claiming more than $30,000 in damages because they claimed the easement was worth less than $30,000 when they sought a remand from federal district court to state district court.

[¶ 33] "Judicial estoppel prohibits a party from assuming inconsistent or contradictory positions during the course of litigation." Peterson v. Sando, 2011 ND 206, ¶ 10, 806 N.W.2d 172 (quoting BTA Oil Producers v. MDU Res. Grp., Inc., 2002 ND 55, ¶ 14, 642 N.W.2d 873). In BTA, at ¶ 14 (quoting 28 Am. Jur. 2d Estoppel and Waiver § 74 (2000)), we explained judicial estoppel precludes a party from taking totally inconsistent positions in legal proceedings:

The fundamental concept of judicial estoppel is that a party in a judicial proceeding is barred from denying or contradicting sworn statements made therein. Judicial estoppel is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent, conflicts with, or is contrary to one that she has previously asserted in the same or in a previous proceeding; it is designed to prevent litigants and their counsel from playing fast and loose with the courts, and to protect the integrity of the judicial process. Judicial estoppel doctrine is equitable and is intended to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories. The purpose of the doctrine of judicial estoppel is to reduce fraud in the legal process by forcing a modicum of consistency on the repeating litigant.

The doctrine applies only where a party's subsequent position is totally inconsistent with its original position, and does not apply where distinct or different issues or facts are involved.

[¶ 34] In Dunn v. North Dakota Dep't of Transp., 2010 ND 41, ¶ 10, 779 N.W.2d 628, we recognized we had "consistently assumed, without deciding, the doctrine of judicial estoppel applies in North Dakota," and we had declined to apply judicial estoppel in several cases because a party's subsequent position was not entirely inconsistent with that party's original position. See DeMers v. DeMers, 2006 ND 142, ¶¶ 18–19, 717 N.W.2d 545; Ingebretson v. Ingebretson, 2005 ND 41, ¶¶ 16–18, 693 N.W.2d 1; Meide v. Stenehjem, 2002 ND 128, ¶¶ 13–15, 649 N.W.2d 532; BTA, 2002 ND 55, ¶¶ 13–18, 642 N.W.2d 873. In Dunn, at ¶ 11, however, we concluded a litigant was judicially estopped from taking inconsistent and contrary legal positions in an application for a writ of mandamus and in a subsequent separate appeal to this Court.

[¶ 35] We conclude the Krenzes have not taken entirely inconsistent positions in this proceeding because XTO had not trespassed on the Krenzes' land when Courtney Krenz made a statement in an affidavit in federal district court in January 2011 about the value of the easement. Rather, at that time, XTO's pipeline across section 15 had not been constructed and was not operating and XTO had not used the Krenzes' private road in section 15 to access the Ward Well. XTO's actions after the remand from federal court changed the underlying factual nature of this case and the court allowed the Krenzes to amend their complaint to address those changes. We conclude the Krenzes are not judicially estopped from claiming more than $30,000 in damages. The district court awarded damages only for the pipeline trespass, however, and because we have remanded the issue about the interpretation of the April 2007 pipeline easement and the pipeline trespass for further proceedings, we also reverse the court's award of damages for the pipeline trespass. After further proceedings on remand, the district court may ascertain damages according to the liability found on all issues.

B

[¶ 36] XTO argues the district court should not have required the parties to abide by their 2010 negotiations and documents signed by the Krenzes in November 2010 for a surface damage agreement, a pipeline easement, and a surface damage agreement for roads, because the court ruled those documents were not binding contracts.

[¶ 37] The district court ruled the 2010 negotiations and documents signed by the Krenzes in November 2010 were not en-

forceable contractual agreements. The court nevertheless required the parties to abide by the documents signed by the Krenzes as part of its remedy to guide the parties' future relationship. Although the terms of those negotiations and signed documents did not mature into a legally enforceable written contract, those terms may establish a point of reference for the parties' future relationship. There was evidence, however, XTO did not agree to some of the Krenzes' modifications to the documents they signed in November 2010, and we decline to approve the wholesale incorporation of those 2010 documents without consideration of XTO's actual use of the Krenzes' land. We reverse the judgment to the extent it incorporated all of the provisions of the documents signed by the Krenzes in November 2010, and we remand for the district court to craft an appropriate remedy specifically tailored to the parties' future relationship and in view of the court's ultimate rulings on the trespass claims.

### C

[¶ 38] XTO argues the district court's ruling regarding liability under N.D.C.C. ch. 38–11.1 should be reversed. XTO argues the Krenzes' statutory claim is time-barred because they failed to provide the requisite notice of their injuries under N.D.C.C. § 38–11.1–07, which says a person seeking compensation "shall notify the mineral developer of the damages sustained by the person within two years after the injury occurs or would become apparent to a reasonable person."

[¶ 39] XTO spud the Ward Well in section 23 in February 2010 and completed the well in April 2010. The Krenzes initially sued XTO in December 2010. After the district court denied the Krenzes' request for a preliminary injunction, XTO constructed the pipeline in section 15 in August 2011. On February 28, 2012, the court ruled as a matter of law XTO's construction of the pipeline in section 15 was a trespass. In March 2012, the district court approved the parties' stipulation for a stay of proceedings to pursue settlement of the claims. The court lifted the stay in December 2012 and thereafter granted the Krenzes' motion to amend their complaint. Although the district court did not separately award the Krenzes damages under N.D.C.C. ch. 38–11.1, to the extent the court determined liability under that chapter, we conclude the Krenzes' actions in the context of these proceedings complied with the notice requirements of N.D.C.C. § 38–11.1–07.

### V

[¶ 40] In their cross-appeal, the Krenzes raise issues about the scope of the parties' rights and obligations under the Mendenhall lease. As relevant to these issues, the Mendenhalls owned severed mineral interests under some of the Krenzes' land and leased those interests to XTO's predecessor in interest in 2004. The Mendenhall lease includes the Krenzes' land in the southwest quarter of the southwest quarter of section 14, the southeast quarter of the southeast quarter of section 15, the northeast quarter of the northeast quarter of section 22, and the northwest quarter of the northwest quarter of section 23. The Ward Well is located in the northwest quarter of the northwest quarter of section 23 and is on a two-section spacing unit consisting of sections 23 and 26. The Ward Well spacing unit is subject to a forced pooling order issued by the North Dakota Industrial Commission. The only acreage under the Mendenhall lease within the Ward Well spacing unit is the northwest quarter of the northwest quarter of section 23.

[¶ 41] The Krenzes argue XTO cannot use the surface of their land subject to the Mendenhall lease in sections 14 and 15 to develop mineral interests from the Ward Well not subject to the Mendenhall lease but in the spacing unit for that well. XTO responds it can use the surface of those lands subject to the Mendenhall lease in sections 14 and 15 to access minerals subject to the lease or pooled with minerals subject to the lease. XTO claims it has the right to treat the entire spacing unit as if it were part of the Mendenhall lease under the lease's pooling provision and N.D.C.C. § 38–08–08(1).

[¶ 42] When a mineral estate is severed from the surface estate, the mineral estate is dominant and the surface estate is servient in the sense it is charged with a servitude for the implied right of the mineral lessee to develop the minerals. Hunt Oil Co. v. Kerbaugh, 283 N.W.2d 131, 135 (N.D. 1979). A mineral lessee thus has an implied right to use as much of the lease surface as reasonably necessary to develop and produce minerals. Hunt Oil, at 135; Feland v. Placid Oil Co., 171 N.W.2d 829, 833–34 (N.D. 1969). The mineral lessee, however, may not use more of the surface estate than is reasonably necessary to explore, develop, and transport minerals. Hunt Oil, at 135. As a corollary to that implied right, a lessee generally cannot, in the absence of contractual permission, use the surface of one lease to benefit mining operations on adjacent land. See 1 Williams & Meyers, Oil & Gas Law § 218.4 (2016); Annotation, Right of Owner of Title to or Interest in Minerals Under One Tract to Use Surface, or Underground Passages, in Connection With Mining Other Tract, 83 A.L.R.2d 665, 670 (1962). A mineral lease is generally indivisible, and production or operations on any part of land included within a lease will extend the lease beyond its primary term as to all the land subject to the lease. Horob v. Zavanna, LLC, 2016 ND 168, ¶ 24, 883 N.W.2d 855; Egeland v. Continental Resources, Inc., 2000 ND 169, ¶ 16, 616 N.W.2d 861.

[¶ 43] Under N.D.C.C. § 38–08–07(1), the North Dakota Industrial Commission may fix spacing units "[w]hen necessary to prevent waste, to avoid the drilling of unnecessary wells, or to protect correlative rights." The Industrial Commission also may compulsorily pool all interests in a spacing unit and "[o]perations incident to the drilling of a well upon any portion of a spacing unit covered by a pooling order must be deemed, for all purposes, the conduct of such operations upon each separately owned tract in the drilling unit." N.D.C.C. § 38–08–08(1). Pooling and unitization orders may encompass acreage from parts of several different leases, and the main effect of pooling and unitization is to preserve an entire lease even if only a small portion of the lease is included in a pooled spacing unit. Horob, 2016 ND 168, ¶ 24, 883 N.W.2d 855; Egeland, 2000 ND 169, ¶ 16, 616 N.W.2d 861. Under pooling and unitization, a lessor's interests can be diluted by inclusion of only a portion of leased land in a unit with land held by other interests. Horob, at ¶ 24; Egeland, at ¶ 16.

[¶ 44] The dilution of a lessor's interest has been alleviated by the use of Pugh clauses which "protect the lessor from the anomaly of having the entire property held under a lease by production from a very small portion" of the leased property. Egeland, 2000 ND 169, ¶ 17, 616 N.W.2d 861. Pugh clauses vary widely in form but generally provide for severance of part of a lease where less than all the leasehold is included in a single spacing unit. Id. To override the general rule for indivisibility of a mineral lease, however, Pugh clauses must clearly and explicitly direct a division of the lease into several

parts and direct that production on the pooled section does not constitute production on the part of the lease not pooled. Id.

[¶ 45] Our cases on divisibility and severability of leases have generally addressed interpretation of the mineral leases and the pooling and unitization orders. See, e.g., Horob, 2016 ND 168, ¶ 26, 883 N.W.2d 855 (involving interpretation of lease and communitization agreement); Tank v. Citation Oil & Gas Corp., 2014 ND 123, ¶¶ 11–33, 848 N.W.2d 691 (involving interpretation of lease); Egeland, 2000 ND 169, ¶¶ 15–31, 616 N.W.2d 861 (involving interpretation of lease and pooling order). The decisions primarily relied upon by the parties also deal with interpretation of the leases and pooling agreements. See Kysar v. Amoco Prod. Co., 2004–NMSC–025, ¶¶ 40–51, 135 N.M. 767, 93 P.3d 1272 (construing leases and communitization agreement); Key Operating & Equip., Inc. v. Hegar, 435 S.W.3d 794, 799–800 (Tex. 2014) (discussing legal consequence of pooling in context of lease authorizing pooling with other tracts).

[¶ 46] The common thread in the foregoing cases generally deals with the interpretation of the leases and pooling documents. The general rules governing contract interpretation apply to the interpretation of mineral leases and pooling agreements. See Horob, 2016 ND 168, ¶¶ 19–26, 883 N.W.2d 855; Egeland, 2000 ND 169, ¶ 10, 616 N.W.2d 861.

[¶ 47] The Mendenhall lease authorizes the lessee to pool or unitize all or any part of the leasehold and mineral estate with other land or leases in the immediate vicinity. The lease provides that the production on a unit including all or part of the lease is treated as if it is production under the lease. See N.D.C.C. § 38–08–08(1) (authorizing forced pooling orders and stating operations upon any portion of a spacing unit covered by a pooling order must be deemed, for all purposes, the conduct of such operation upon each separately owned tract in the drilling unit). In October 2010, the Industrial Commission issued a forced pooling order for the Ward Well spacing unit, pooling all the interests in the spacing unit. Under the language of the lease and N.D.C.C. § 38–08–08(1), production on a unit including all or part of the lease is to be treated as if it is production under the lease.

[¶ 48] The Mendenhall lease also includes a Pugh clause:

Notwithstanding the provisions of this lease to the contrary this lease shall terminate at the end of the primary term as to all of the leased land except those tracts within a production or a spacing unit prescribed by law or administrative authority on which is located a well producing or capable of producing oil and or gas or on which Lessee is engaged in drilling or reworking operations.

[¶ 49] Pugh clauses generally authorize the severance of parts of a leasehold outside a pooled spacing unit and operate to terminate the lease for tracts of land that are severed from producing parts of the lease in a pooled spacing unit. See Egeland, 2000 ND 169, ¶¶ 16–18, 616 N.W.2d 861. Pugh clauses are generally intended to terminate nonproducing parts of mineral leases outside a spacing unit. Id.

[¶ 50] According to the Krenzes, the spacing unit for one of the Southern Wells in section 21 is sections 14 and 15, and the parties do not dispute the Mendenhall lease has not been terminated for the parts of sections 14 and 15 included in it. Under the language of N.D.C.C. § 38–08–08(1), the language of the Mendenhall lease authorizing pooling, and the absence of any specific language in the Pugh clause

or in other provisions of the lease addressing this issue, we conclude the property subject to the Mendenhall lease in sections 14 and 15 may be used for operations on property within the spacing unit in sections 23 and 26 that are not subject to the Mendenhall lease. We decline the Krenzes' invitation to add additional language to the Mendenhall lease. Under these circumstances, we conclude the district court correctly construed the Mendenhall lease to authorize XTO to use the parts of sections 14 and 15 subject to the Mendenhall lease for operations within the Ward Well pooled spacing unit but outside the Mendenhall lease.

## VI

[¶ 51] We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

[¶ 52] Dale V. Sandstrom, S.J.

Daniel J. Crothers

Lisa Fair McEvers

Carol Ronning Kapsner

Gerald W. VandeWalle, C.J.

[¶ 53] The Honorable Jerod E. Tufte was not a member of the Court when this case was heard and did not participate in this decision. Surrogate Judge Dale V. Sandstrom, sitting.